THE PEOPLE OF THE STATE OF NEW YORK ex rel. WILLIAM FONG, Appellant, *v.* HARRY C. HONECK, Warden of the City Prison, and Another, Respondents.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. WILLIAM FONG, Appellant, *v.* GROVER WHALEN, Police Commissioner, Respondent.

Second Department, December 13, 1929.

*Robert R. Lawson,* for the appellant.

*John J. Lee [Charles J. Dodd, District Attorney,* with him on the brief], for the respondents.

RICH, J. Relator was taken into custody upon a warrant of extradition issued by the Governor of the State of New York on September 12, 1929, upon the ground that he is a fugitive from justice from the State of Massachusetts, county of Suffolk. He is charged with the crime of murder in the first degree. The crime is alleged to have been committed by the relator and another on August 5, 1929, at about nine-forty-five P. M., at 407 Harrison avenue, in the city of Boston, State of Massachusetts. Relator, upon a writ of habeas corpus, questioned the legality of his detention and introduced testimony upon the hearing tending to show

that he was not present in the demanding State at the time of the commission of the alleged crime. The learned Special Term has found, however, that he has not accounted for his whereabouts between seven and twelve P. M. on the night of August 5, 1929, and has not conclusively established that he was not in the demanding State at the time of the commission of the crime, and has dismissed the writ. This appeal is from the order accordingly entered.

This court in *People ex rel. Genna* v. *McLaughlin* (145 App. Div. 513) held that, before the warrant may be sustained, it must appear that the relator was present in the demanding State when the crime was committed, that the warrant only makes out a *prima facie* case, and that the relator may prove an alibi to defeat the warrant. Mr. Justice CARR, in writing for the court, said: " In order that a fact may be determined conclusively in any judicial proceeding, it is not necessary that the proofs should be without any conflict. Nor does proof fall short of being conclusive simply because there is other proof to the contrary. The true rule should be that this question of jurisdictional fact must be determined by the court as is any other question of fact which it has the power and duty to determine, according to the rule of the common law as to the preponderance of evidence. Any different rule might easily lead to most oppressive consequences, which suggest themselves at once to any observing mind." Since the decision in that case, however, the United States Supreme Court has held that the issue of fact whether the accused was in the demanding State at the time of the commission of the crime is not to be determined in the same manner as other questions of fact, according to the ordinary preponderance of the evidence, but rather that the relator must " *conclusively* " establish that he was not present in the demanding State at the time of the commission of the crime. (*Biddinger* v. *Commissioner of Police*, 245 U. S. 128; *Hogan* v. *O'Neill*, 255 id. 52.) The only question presented by this appeal, therefore, is whether or not appellant conclusively established that he was not present in the demanding State at the time of the commission of the crime.

Relator upon the first hearing produced seven witnesses who testified to his presence at different places in the city of New York on August 5, 1929, between the hours of nine-thirty A. M. and seven P. M. One of these witnesses (De John) testified to being with him in the borough of Brooklyn between five-forty-five and six-fifteen P. M., and between nine and eleven P. M. Upon a subsequent hearing relator called two additional witnesses, one of whom testified to his presence in the borough of Brooklyn between six-thirty and seven-thirty P. M., and the other, a garage helper, testified that relator was at the garage at midnight, and upon a further hearing

relator called three additional witnesses. One testified that he saw relator with the witness De John descending the stairs of an apartment house at 410 State street, Brooklyn, at about nine-forty-five P. M., on August 5, 1929.

To meet this, the prosecution produced two witnesses, one of whom, Whalen, a taxi driver, testified: " I was driving a taxicab down Harrison Avenue. I had a passenger in the cab and was taking her to deliver down the street. At a point near 407 Harrison Avenue I heard some shots. I made a remark about the shots and slowed up. Within a few seconds two Chinamen — I saw two Chinamen running along the sidewalk on my right. I was on the right hand side of the street. I kept abreast of them for about two blocks, when they made a right turn into another street. I stopped the cab, glanced back in the direction of the two Chinamen and myself had come and saw an officer running down the street. I pointed the direction the two Chinamen had taken. They were not out of my sight when I pointed. The officer jumped on the running-board and we followed them up the street for about one block. At the next corner the two men separated. The officer fired a shot in the air and hollered to one of them to stop. The man stopped and the officer took hold of him and put him in the cab. The other man disappeared. Q. The man that the officer caught, is he in custody in Boston now, as far as you know? A. Yes. Q. Did you ever see the other man again? A. Yes. Q. Where did you see him, and when? A. In Brooklyn. Q. When? A. On August 14th, 15th, the morning of the 16th. Q. Have you seen him here in court today? A. Yes. Q. Where is he? (Witness looks around in the court room.) A. Well, I did see him over here a short time ago. By the Court: Q. Look around? A. Yes — the second man from the end, facing this way (indicating). By Mr. Lee: Q. The man with the glasses and the straw hat (pointing)? A. The man with the glasses. By the Court: Q. Is that the man? A. That is the man." Upon cross-examination he said: " Q. Both of these men were running along parallel to your taxi, weren't they? You could have gotten a good look if you tried? A. If I had gone fast and got ahead of them. Q. Now, Mr. Whalen, will you please describe the man you saw the profile of? A. Describe one of the men? Q. Describe the man that you claim was William G. Fong that was running on the outside, that was not captured. Describe his profile. A. I can remember especially high cheekbones. By the Court: Q. High cheekbones? A. Yes; a full face — fuller than the average. By Mr. Lawson: Q. Was there any particular characteristic about that profile? A. The cheekbones." The other witness, one Siegel, testified that defendant resembled the

man he saw in Boston upon the night of the murder. Relator on August 7, 1929, sent a telegram to one Lem, who had been apprehended in Massachusetts, also charged with the crime, requesting $300. Evidence was introduced at a later hearing, however, tending to show that he had business dealings with Lem and had sent similar telegrams months prior to August 5, 1929, and Police Officer Sheehan testified that the relator had denied knowing Lem.

It was at night, the man was running, and the taxi driver was able to distinguish only the man's profile. The only characteristic he observed was high cheekbones. Identification of the fugitive, under the circumstances, must have been uncertain, and in view of the testimony of the various witnesses called by the relator and to which I have referred, there is such a probability that the taxi driver was mistaken in his identification as to make it conclusively appear that the relator was not in the demanding State at the time of the commission of the crime.

·The orders should be reversed upon the law and the facts, the writ sustained, and the relator discharged from custody.

YOUNG, SEEGER and SCUDDER, JJ., concur; LAZANSKY, P. J., dissents upon the ground that there is some proof that the relator is the person who committed the crime.

Orders dismissing writ of habeas corpus reversed upon the law and the facts, writ sustained and relator discharged.