THE PEOPLE OF THE STATE OF NEW YORK ex rel. BRUNO RICHARD HAUPTMANN, Relator, *v.* JOHN HANLEY, Sheriff of Bronx County, Respondent.*

Supreme Court, Bronx County, October 16, 1934.

\* Affd., 242 App. Div. 257.

*James M. Fawcett*, for the relator.

*Samuel J. Foley, District Attorney [Sol Boneparth, Edward F. Breslin* and *Herman J. Fliederblum, Assistant District Attorneys,* of counsel], for the respondent.

*David Wilentz, Attorney-General of the State of New Jersey,* appearing by courtesy of the court.

HAMMER, J.   The relator has been taken into custody upon a rendition warrant issued by the Governor of this State upon requisition of the Governor of the State of New Jersey, upon the ground that he is a fugitive from justice from that State.   There he is charged with the crime of murder of Charles A. Lindbergh, Jr. This child, it is commonly known, was kidnapped.   The relator has questioned the legality of his detention and sued out a writ of habeas corpus.   Habeas corpus is a summary proceeding to test the legality of an arrest, detention or imprisonment.   It is kept within narrow bounds, as much for the protection of the prisoner as for the public interest.   (*Biddinger* v. *Commissioner of Police,* 245 U. S. 128; *Bens* v. *United States,* 266 Fed. 152.)

In interstate rendition, often inaccurately called extradition (*Lascelles* v. *Georgia,* 148 U. S. 537, 543), the jurisdiction of the courts to review the conclusion of the Governor of the asylum State that the accused person is a fugitive from justice, is limited. Some decisions have even questioned the right to review.   (*Ex parte Reggel,* 114 U. S. 642; *Roberts* v. *Reilly,* 116 id. 80; *Appleyard* v. *Massachusetts,* 203 id. 222.)   A charge of crime is essential, but where an indictment is found or an affidavit is made against the fugitive, no evidentiary facts by deposition as to the commission of the crime is required.   (*Pierce* v. *Creecy,* 210 U. S. 387.)

Where the crime is charged on affidavit it may be examined to ascertain that the affiant is stating facts which constitute the crime charged in the demanding State, and that the affidavit is made before a magistrate in accordance with the statute.   No "less degree of certainty is admissible   *   *   *   than is required in an indictment for the same offence.   If any distinction exists   *   *   * the affidavit should be more full and specific."   (*People ex rel. Lawrence* v. *Brady,* 56 N. Y. 182.)   The offense should be therein distinctly and plainly charged.

It has been stated that an information sworn to by a district attorney or other official lacks the safeguards of an indictment found by a grand jury. (*Hurtado* v. *California*, 110 U. S. 516; *Ex parte Bain*, 121 id. 1.)

Whether or not the prisoner is a fugitive from justice is for the determination of the executive. His conclusion must stand unless clearly shown to be without support in fact. (*Hogan* v. *O' Neill*, 255 U. S. 52.) The burden is upon the relator to show by conclusive evidence he is not a fugitive. (*Ex parte Montgomery*, 244 Fed. 967; affd., 246 U. S. 656.) If the requisition and the accompanying papers meet the conditions specified in the Constitution and laws of the United States, the right to have the fugitive surrendered is an absolute right. (U. S. Const. art. 4, § 2, cl. 2; U. S. R. S. § 5278, reproducing with modifications the act of Congress of Feb. 12, 1793, 1 U. S. Stat. at Large, 302, held constitutional in *Prigg* v. *Commonwealth of Pennsylvania*, opinion by Story, J., 16 Pet. 539.) When the papers are in proper form, duly authenticated, the only evidence admissible is such as tends to prove that the relator is not the person who has been charged with the crime in the demanding State; is not substantially charged with a crime; or was not in the demanding State at the time the crime is alleged to have been committed. (*People ex rel. Edelstein* v. *Warden of City Prison*, 138 N. Y. Supp. 1095; *People ex rel. Steel* v. *Mulrooney*, 139 Misc. 525; *People ex rel. Pizzino* v. *Moran*, 137 id. 905; affd., 231 App. Div. 724.)

When the relator contends he was not present in the demanding State at the time of the commission of the crime the rule of law is, he must " conclusively " establish that he was not present. (*Biddinger* v. *Commissioner of Police*, *supra*; *Hogan* v. *O' Neill*, *supra*.) While *People ex rel. Genna* v. *McLaughlin* (145 App. Div. 513) seems to be authority for determining such claim by the preponderance of the evidence, the rule of law now is that it must be conclusively established. (*People ex rel. Fong* v. *Honeck*, 253 N. Y. 536, which, although reversing the conclusion of fact and decision in 227 App. Div. 436, sustains that rule enunciated therein and also stated in *People ex rel. Gottschalk* v. *Brown*, 237 N. Y. 483.) The relator's evidence must be clear and convincing. He must show by uncontradicted facts that he was not in the demanding State. If the evidence is conflicting and reasonable inference can be drawn that the relator was within the demanding State, he should be delivered up for trial. (*People ex rel. Debono* v. *Bd. of Police Commissioners*, 89 Misc. 248; *People ex rel. LaRocque* v. *Enright*, 115 id. 206; *People ex rel. Steel* v. *Mulrooney*, *supra*.)

Defenses to the indictment cannot be entertained but must be referred to the trial in the courts of the demanding State. (*Biddinger* v. *Commissioner of Police, supra; Rodman* v. *Pothier,* 264 U. S. 399; *Black* v. *Miller,* 59 F. [2d] 687.) Where the charge is contained in a formal indictment, the sufficiency thereof as a matter of technical pleading will not be inquired into on habeas corpus. (*Munsey* v. *Clough,* 196 U. S. 364.)

The question of alibi or any question as to the guilt or innocence of the accused may not properly be considered on a habeas corpus proceeding, but must await trial for determination. (*South Carolina* v. *Bailey,* 289 U. S. 412; *People ex rel. Hyatt* v. *Corkran,* 172 N. Y. 176; affd., 188 U. S. 691; *Munsey* v. *Clough, supra.*) Mr. Justice PECKHAM, in *Munsey* v. *Clough* (*supra*), states the rule as follows: " When it is conceded, or when it is so conclusively proved that no question can be made that the person was not within the demanding State when the crime is said to have been committed, and his arrest is sought on the ground only of a constructive presence at that time in the demanding State, then the court will discharge the defendant. *Hyatt* v. *Corkran,* 188 U. S. 691, affirming the judgment of the New York Court of Appeals, 172 N. Y. 176. But the court will not discharge a defendant arrested under the governor's warrant, where there is merely contradictory evidence on the subject of presence in or absence from the State, as *habeas corpus* is not the proper proceeding to try the question of alibi, or any question as to the guilt or innocence of the accused."

In the instant matter the papers based upon an indictment are in proper form duly authenticated, and the only issue raised by relator is that he was not in the demanding State at the time the crime is alleged to have been committed. The relator relies mainly upon the cases of *People ex rel. Genna* v. *McLaughlin* (*supra*), which, as pointed out above, does not correctly state the rule of law now applicable, and *People ex rel. Hyatt* v. *Corkran* (*supra*); *Munsey* v. *Clough* (*supra*), and *Matter of Mitchell* (4 N. Y. Crim. Rep. 596). In *Hyatt* v. *Corkran* there was a stipulation that the relator was not actually within the demanding State at the time of the commission of the crime charged, and it was there held that the relator " showed without contradiction [that is, conclusively] and upon conceded facts that he was not within the State of Tennessee at the times stated in the indictments [and therefore] \* \* \* he was not a fugitive from justice within the meaning of the federal statute on that subject." (Words in brackets mine.) Both the cases of *Hyatt* v. *Corkran* (*supra*) and *Munsey* v. *Clough* (*supra*) state the rule of law to be that the burden is upon the relator to show by conclusive evidence that he was not in the demanding

State at the time of the commission of the crime. *Matter of Mitchell* is a memorandum opinion by the Governor of the State of New York. The facts as given in the opinion are as follows: " No copy of an indictment accompanies the requisition in this case, and none seems to have been found, but there is an affidavit made by a police officer taken by a justice of Jersey City, charging Mitchell with having committed the offense of manslaughter at Jersey City on November 25th last. There is also annexed to such requisition another affidavit made by a policeman, stating that he knows Mitchell, and that Mitchell ' has fled from the State of New Jersey, and is now in the city of New York.' * * * The ownership of the premises is disputed, and if I were permitted to determine that question in this proceeding, I should find as a question of fact that Mitchell was not the owner thereof. * * * The actual presence of the accused party in the demanding State, at the time of the commission of the alleged offense, is a jurisdictional fact. It must be proved, like any other fact. It may be rebutted the same as any other fact. If such actual presence cannot be established the accused party cannot be said to be a fugitive from justice. * * * In the present case it is not pretended that Mitchell was present in New Jersey at the time the alleged offense was committed. It is conceded that on that day he was in our own state, of which he was and is a resident. It is not claimed that there has been any actual fleeing from New Jersey. There has been neither flight nor concealment shown." That *Matter of Mitchell* can be of little comfort to the relator in the instant matter appears from a mere reading of the Governor's opinion.

A fugitive from justice is generally defined as a person who commits a crime within a State and leaves such jurisdiction without waiting to abide the consequences of such act. (*Matter of Voorhees,* 32 N. J. L. 141.) " The charge that he committed a crime in that State, coupled with the fact that he is found in this State, is conclusive upon the question whether he is a fugitive from justice." (*People ex rel. Draper* v. *Pinkerton,* 17 Hun, 199.)

The relator here testified on his own behalf and called as witnesses to support his testimony Christian Fredericksen and Kate Fredericksen, former employers of relator's wife, Anna Hauptmann, relator's wife, and Howard James Knapp, an officer of a former employer. He also introduced in evidence a record of his employment at the Hotel Majestic, Seventy-second street and Central Park West, New York city; check dated March 31, 1932, thirty-six dollars and sixty-seven cents, for salary while employed at the hotel, and a check dated April 15, 1932, six dollars and sixty-seven cents, for salary at the hotel.

The relator denied he was in the State of New Jersey on Tuesday, March 1, 1932, the day upon which the crime is charged to have been there committed. Affirmatively he accounted for his presence as follows:

On the Monday night preceding he slept at his home at 1279 East Two Hundred and Twenty-second street, Bronx, New York city. He awakened at six on the morning of Tuesday, March 1, 1932, and at a quarter to seven took his wife by automobile to the bakery store at 3815 Ryder avenue, Bronx, where she worked. He then took his automobile home, which took about two minutes, and went to the Hotel Majestic, Central Park West and Seventy-second street, Manhattan, or to the employment agency on Sixth avenue, looking for a job. He was not sure which. He stated he went to the agency and from there was sent to the hotel, around the 1st of March, 1932, the end of February, or early in March around the day in question. During 1929, 1930 and 1931 he worked steadily as a carpenter, but not in 1932. If he worked at the hotel he quit at five o'clock, or if not he was at the agency all day. He then went home, changed his clothes and went down to the bakery and met his wife, getting there between six and seven, where he had his supper. When arrested on September 16, 1934, he told the officers that on March first he was working at the Hotel Majestic. He did this, he stated, because they gave him no chance to think. Witness Knapp, assistant treasurer of the Reliance Management Property, Inc., in charge of payrolls for the Majestic Hotel, testified that the company's records showed Hauptmann was employed there from March fifteenth to some time in April.

On cross-examination the relator stated: " Q. What day did you quit your employment with the Majestic Hotel? A. I don't know. Q. You don't know? A. No. Q. Nothing at all about the time to refresh your recollection? A. It must be in April. Q. In April — how long did you work for this Majestic Hotel Company? A. I cannot remember. Q. When you were arrested, you answered that you worked there from February right through steady every day, right through until April, didn't you? A. Yes, but after thinking, I am not quite sure. Q. Well, that is not correct then, is it — you did not work there from February till April, did you? A. I cannot answer."

When arrested relator had in his possession a twenty-dollar gold bill. When asked about it he said it was part of $300 saved up in gold certificates received from people or from the bank. On this hearing he admitted the statement was untrue and that he was trying to hide the money. He testified O'Ryan, a police inspector

(commissioner), asked him about other money and he admitted there was about $14,000 in his garage, in the south wall. He stated that was all the money but he knew it was not. The district attorney later in the investigation questioned relator about a piece of lumber and if there was more money and the relator said, " No." At that questioning on being confronted with some $800 of gold certificates he admitted it was additional money he had hidden. His explanation was that the reason he did not tell about it was because several weeks before he was arrested he hid it in a board two by four, in which in October, 1931, he had bored holes and had hidden a small German pistol, in size about three or four inches, loaded with seven bullets, the hiding place of which he did not wish to disclose. All of the money mentioned was Lindbergh ransom money. The piece of wood was turned with the smooth surface outward to view towards the garage interior and fastened with the holes towards the exterior or the garage siding boards, so that the holes could not be seen. There was found in relator's home a board with the address and phone number of the " go-between." Relator admitted he wrote the numbers but could not make out if the other handwriting was his. Relator's explanation upon redirect examination by his own counsel of his possession of the ransom money is as follows: " Q. What was your reason for not taking these gold certificates that you found in the shoe box to some bank and turning them all in to some bank? A. The main reason was, this was not really my money. Q. What do you say? A. It wasn't my money — It was not my money, I found, and I. Fisch's brother, he was coming over to the United States to settle the whole affair with his brother anyway, so I thought we will keep it in the house and — I did not like to have any trouble at all, because when I go to the bank and turn in so many gold certificates I will have to answer a lot of questions about it, so I kept it at home. Q. Yes, and did you know that you could have been arrested for having these gold certificates at the time you found them in this shoe box, did you know that? A. Well — not directly. Q. And was that the reason why you hid them in the garage? A. Yes, that is the reason. Q. You say that you found this money in the shoe box about three weeks before you were arrested; and were you arrested by the police and detectives about the 16th of September, 1934, about that date? A. Yes. Q. September 19, 1934? A. Yes."

On cross-examination the relator admitted that he had a police record in that in Europe in June, 1919, he was convicted of grand larceny, and sixteen days thereafter again convicted of robbery with a gun.

The relator illegally entered the country three times, the first time in 1923 under the name of Perlmeyer, and the second time under the name Hauptmann. Both times he was sent back. The last time, however, he was successful in his attempt. He admitted he knew he had entered and was in the country illegally.

Christian Fredericksen, the owner of the restaurant in which Mrs. Hauptmann worked, and his wife testified that Hauptmann usually called there for his wife on Tuesday nights. Fredericksen testified that he saw Anna Hauptmann working in the store on the evening of March 1, 1932. When asked if the relator called on March 1, 1932, Fredericksen testified: " He usually called for her always on Tuesday nights and Friday nights. * * * I say usually — I cannot swear he was there every week." Previously when questioned upon his investigation by the district attorney the witness, when asked if he remembered whether the relator was at the store on that Tuesday night, answered, " No." Mrs. Fredericksen testified that Anna Hauptmann, the relator's wife, was working at the bakery on March 1, 1932; but on being asked if the relator called for his wife at the store she answered that she was not in the business. Anna Hauptmann, relator's wife, when questioned about Tuesday, March 1, 1932, said that she could not remember if her husband brought her down on that morning, but he usually did bring her down every morning, and when asked if the relator was at home with her on the Monday night previous she stated that she did not remember that day, he was usually home. She testified that on the night of March 1, 1932, the relator called for her at the store and took her home about half-past six or seven o'clock. " On Tuesday and Friday nights he was always in the store with me so he had his supper there. Mrs. Fredericksen told me so — I should give him supper when he came down."

On cross-examination the witness admitted that on being questioned by Police Inspector Bruckmann and others she told them that she had no recollection at all of what happened March first and that it was too far back and that she did not know whether her husband (the relator) was with her or not.

In considering evidence upon a habeas corpus proceeding a rule has been laid down for the guidance of the court of first instance. It is: " In construing the evidence we are not to be governed by technical rules as in the case of a trial for a crime, but to regard it liberally in favor of the demanding state." (*Ellison* v. *Splain*, 49 App. D. C. 99, 100; 261 Fed. 247, 248.)

On behalf of the respondent, after testimony of Albert S. Osborn, handwriting expert, that in his opinion they were written by relator,

there was placed in evidence writings which in the record are Exhibits H, I, J and K. Previously Exhibit G was received with motion to strike out reserved unless connection was shown. This also, in the opinion of the witness Osborn, was written by the relator. Exhibit G is the note found in the Lindbergh home on March 1. 1932, upon the discovery of the kidnapping. It contains the demand for ransom. Exhibit H asks: " Why did you ignore our letter which we left in the room? " Exhibit K states: " We will send you the sleeping suit from the baby." Exhibit J asks: " Did you send the letter package to Mr. Lindbergh? " and states, " It contains the sleeping suit from the baby."

The witness Millard Whited testified he lived in West Amwell township, N. J., about a mile and a half from the Lindbergh estate, on the farm adjoining, and between that and the estate there was a ten-foot space. He stated that between February 18 and 20, 1932, he saw the relator about a mile from the Lindbergh's driveway stepping out of a piece of woodland belonging to the witness. He testified he again saw the relator between February 25 and 27, 1932, about three-quarters of a mile from the Lindbergh estate. He identified the relator in court by leaving the witness stand and placing his hand on the relator's shoulder.

The relator denied this testimony and also that he wrote Exhibits G, H, I, J and K. The general credibility of the witness Whited was also attacked by two rebuttal witnesses.

Bearing in mind the rule that evidence should be construed liberally in favor of the demanding State, the Exhibits G, H, I, J and K in my opinion for the purposes of this hearing constitute admissions of the presence of relator in New Jersey at the time of the commission of the crime. The testimony of the witness Whited may be weakened by the attack made on his credibility, but, considered by the same rule, it adds to the weight of the admissions showing presence. I do not regard this statement as setting forth a rule of evidence for the guidance of a trial court which later may consider the same evidence. My conclusion is that relator has not conclusively established that he was not in the demanding State at the time it is charged the crime was committed.

Writ dismissed and relator remanded to custody.